

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00260-CR

_____

ISMAEL JAEN, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1645411

---

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

## I. INTRODUCTION

Appellant Ismael Jaen appeals his conviction for continuous sexual abuse of a child under the age of fourteen. *See* Tex. Penal Code Ann. § 21.02(b). In two issues, Jaen argues (1) that the evidence is insufficient to show that the "30-day element had been met" and (2) that the trial court erred by admitting the video recording of the complainant's forensic interview. Viewing all the evidence in the light most favorable to the verdict, we conclude that sufficient evidence supports the jury's verdict that Jaen committed at least two acts of sexual abuse separated by a time period of thirty or more days. As to the admission of the forensic-interview video, Jaen waived his argument by failing to challenge both grounds that the trial court gave for its ruling on the video's admissibility. Accordingly, we affirm.

## II. BACKGROUND

A number of witnesses testified for the State: the complainant, a nurse who evaluated the complainant when she presented to the emergency room with abdominal pain, a sexual-assault nurse examiner (SANE), the forensic interviewer, the CPS investigator, and a police detective. The defense put on multiple character witnesses before Jaen took the stand. Because Jaen challenges the sufficiency of the evidence, we provide a detailed summary of the witnesses' testimonies.

## A.    The Complainant

The complainant, who was twenty-one years old at the time of trial, testified that she (along with her mother, stepfather, and stepsister) had moved to Texas in 2011 when she was in the second grade.[1] The complainant said that they moved in with her aunt and uncle (Jaen), who also housed the complainant's grandmother and cousin. The complainant's family moved out of Jaen's house for a while, but after her mother and stepfather divorced, the complainant and her mother moved back in with Jaen and his wife, who still housed the complainant's grandmother and cousin as well as Jaen's wife's disabled sister; the complainant believed that this second move to Jaen's house occurred when she was finishing fourth grade and starting fifth grade, if she remembered correctly.[2]

---

[1]The school records that were admitted into evidence provided helpful information about the grade that the complainant was in during each school year, and her testimony provided information about her age. We summarize that information as follows:

| School year | Grade | Ages |
| --- | --- | --- |
| 2010–2011 | Second | 8–9 |
| 2011–2012 | Third | 9–10 |
| 2012–2013 | Fourth | 10–11 |
| 2013–2014 | Fifth | 11–12 |
| 2014–2015 | Sixth | 12–13 |
| 2015–2016 | Seventh | 13–14 |

[2]The complainant acknowledged that it was a little hard to remember the years because the incidents happened so long ago.

The first incident that the complainant recalled that felt "like it was not okay" was when Jaen slapped her on the butt when she walked past him.

The next incident that the complainant recalled was when her aunt told her to go upstairs and tell Jaen that some food was ready, and when she did, he showed her his penis. She said that he had been holding it outside his clothes and that she had gotten scared, had screamed, and had run downstairs. When the complainant came downstairs, she asked if anyone had heard her scream, and they said no.

When asked about the next time that something had happened, the complainant responded, "I don't have any memory of the very first time. . . . [W]hen I think of everything that he has done, it's just a lot of -- all the memories coming at once. I don't have an exact date." When asked whether it all occurred around the time that she was in fourth grade when she and her mother had moved back to Jaen's house, the complainant agreed.

The complainant then described an event that occurred in the garage. She said that Jaen had asked her for help reaching something for him. She then provided additional details, stating that there were tool shelves in the garage and that Jaen had wanted to lift her so that she could reach a tool for him. The complainant said that she did not doubt anything, so she allowed him to pick her up. But he did not pick her up by the waist; instead, his hand touched her vagina on the outside of her clothes, and then he picked her up. As he slowly put her down, he started touching her breasts on top of her shirt. The complainant said, "I remember trying to, like,

4

push him so that way I c[ould] get down. And I saw my grandma was there[ in another part of the house], so I went and I sat there with her, and I watched TV with her."

The complainant testified about an event when Jaen did more than touch her over her clothes; this incident occurred after a bike ride. When the complainant and Jaen put their bikes away, he grabbed her so that she would not go inside the house. While her body was against the brick wall, Jaen then pulled her bottoms down and put his penis into her vagina. She said that it had felt "really uncomfortable" and had hurt a lot and that she had tried to get him off her. Eventually, she succeeded and went inside the house where her aunt was washing dishes. The complainant said that was the first time that anything like that had happened to her.

The complainant also testified about an event that had happened when Jaen had put her on the bed in the bedroom that Jaen and her aunt shared. The complainant could not recall what had led up to Jaen's putting her on the bed. The complainant said that Jaen's pants were down to his ankles, that he had shoes on, and that she had seen his penis. She could not recall if she had clothes on or if he had put his penis in her vagina on this occasion. But she testified that he had put his penis in her vagina more than one time.

When asked whether the event in the garage and the other incidents had occurred further apart or really close together, the complainant responded, "I would say they were really close together." But she agreed that due to the passage of time, it was hard to know whether they had occurred days or weeks apart. The complainant

was then asked whether there were additional instances that had occurred for which she did not recall the specifics, and she said, "Possibly, yes." The complainant said that "the touching" had stopped when she started her period in fifth grade.[3]

While in the fifth grade, the complainant attended a school assembly at which the speaker said to "just say no" if an adult touches your private areas and that legal action would occur if you reported it to an adult. The complainant said that was the first time that she realized that what Jaen had been doing to her was not okay, but she stayed quiet about it at that time.

The complainant and her mother eventually moved out of Jaen's house a second time and moved in with Mother's boyfriend Eduardo. Some time later, the complainant and her mother got into an argument. During that argument, the complainant revealed that Jaen had touched her in the past. The complainant did not give her mother any details, and the police were not called.

Approximately two to four weeks after the argument with her mother, the complainant went to the hospital with abdominal pain and learned that she needed to have her gallbladder removed. The emergency-room nurse asked the complainant if she had ever been raped or molested, and the complainant started crying. The nurse asked the question again, and the complainant nodded. After additional questioning, the complainant disclosed who had raped her.

---

[3]The complainant agreed that everything that happened with Jaen occurred when she was thirteen or before she turned thirteen. Later she specified that it had occurred when she was eleven or twelve.

On cross-examination, defense counsel delved into what the complainant had said during the forensic interview that took place on December 21, 2018:

Q. Did you tell [the forensic interviewer] that the first incident happened about half a year after you moved to Texas?

A. No, I don't remember.

Q. Did you tell [the forensic interviewer] that you were in intermediate school?

A. Yes.

Q. That would be Chisholm Intermediate School?

A. Chisholm Trail.

Q. Chisholm Trail Intermediate School.

And so that would have been the fifth or sixth grade?

A. Yes.

Q. Okay. Not when you were nine years old in the second grade or third grade, right?

A. No.

Q. And not when you were 10 years old in the third grade or the fourth grade?

A. I don't remember.

Q. Well, you said that you were older than that, so you would have been in the 11th -- you would have been 11 years old or 12 years old, correct?

A. Correct.

7

Q. Okay. Did you tell [the forensic interviewer] that you were in -- in the garage when your uncle was trying to lift you up and that was the first incident that you could recall?

A. Correct.

Q. So rather than being in this brain fog that you've talked about here in front of the jury, you actually do remember now that you told [the forensic interviewer] that the garage incident was the first incident, right?

A. I wouldn't say it was the first incident.

Q. You don't remember telling [the forensic interviewer] that it was?

A. The first -- no, it's been so long. I don't remember if I told her if it was the first incident.

## B.     The ER Nurse

Nurse Jacqueline Faith Swiney evaluated the complainant on November 19, 2018, when she presented in the emergency room with abdominal pain. At that time, the complainant was "[a]round 16" years old.

During the exam, Nurse Swiney asked the complainant personal questions, including questions about sexual activity. The nurse read a paragraph from the notes that she had taken regarding the complainant's responses to those questions:

> [T]his R.N. asked the patient, "When was the last time you had sex?" The patient stated 13. When this R.N. asked how old the sexual partner was, she stated like 40. This R.N. encouraged patient to give details about the 40-year-old male. She stated, "I can't say anything because he pays the bills. My aunt is disabled, and he pays the bills." Patient was not willing to give the name of the 40-year-old. When questioned if there were children in the house with the man, she stated just a toddler. She stated, "I don't want him to go to jail because his son just had a baby."

8

Nurse Swiney testified that after hearing the complainant's responses, she thought to herself, "[T]hat's not sex, and [the complainant] is unaware that she's being abused or has been abused." Nurse Swiney did not see any signs of coaching and felt like the complainant was being truthful.

During cross-examination, the defense asked Nurse Swiney to read from the emergency-room doctor's notes, which stated that the complainant had "been sexually active," that "she uses condom while she has sex,"[4] and that the "[p]atient [had] told nurse that she was raped by her uncle three years ago."

## C.    The SANE

The SANE for the CARE Team at Cook Children's Medical Center saw the complainant on January 4, 2019, and made the following notes about what the complainant had told her:

> My uncle touched me inappropriately. We moved here when I was nine. He started acting differently when I was 10. He has always treated me well and then very nice, but still, he started changing. It started with touching. He would lift my shirt or skirt. He'd say, "Don't worry." It would be in the afternoons, after school. I would be there. My grandmother, at that time, she would always be in the living room . . . . My one aunt, she was disabled, so she was in her room. My other aunt would be with her or in the kitchen. I would be in the kitchen eating or upstairs. He would come in and ask me to help him. At first, it started with touching but eventually progressed to the point where he would put his penis in my vagina. He would undo his zipper and pull his part out. He told me, "Don't say anything.[]"

---

[4]Upon further questioning, Nurse Swiney stated, "I don't know if [the doctor's] referencing another sexual encounter or the one in question."

9

The complainant told the SANE that her uncle is Jaen and that his penis and his finger had touched her vagina. She said that he had fondled her breasts and her vagina, had slapped her butt, and had kissed her on the mouth with his tongue. She said that the incidents had taken place at Jaen's house and that "it" had occurred many times. The complainant did not provide dates but said that the first time it happened was when she was ten years old and that the most recent time was when she was thirteen. The SANE testified that it is very common for children, even teenagers, to not know exact dates because "time runs together" and because "[i]t's very difficult, especially if something happens more than one time, to remember specifically when it was."

The SANE testified that there were no physical findings from the exam but that she did not expect any because the sexual abuse had occurred three years prior. Based on the exam, the SANE concluded that the complainant had been sexually abused.

### D.     The Forensic Interviewer

The forensic-interviewer supervisor at Alliance for Children did not testify about the specific contents of the complainant's forensic interview. She did agree with the prosecutor that the complainant was able to provide some very specific sensory and peripheral details about the sexual-abuse incidents that she described. The forensic interviewer did not have concerns that the complainant had been coached.

**E.      The Recording of the Forensic Interview**

Over Jaen's objection, the recording of the forensic interview was played for the jury. During the forensic interview, the complainant said that Jaen had "molested" her when she was eleven or twelve and that it had happened more than one time.

The first time occurred when she was living at Jaen's house. The complainant was in the kitchen, and Jaen had asked her to come to the garage because he needed her help to reach something. She explained that he first put his hands on her hips, saying that he was going to lift her up, but then his hands kept going lower. He put his hands on her underwear and then put his fingers in her vagina inside her underwear. She said that he also put his penis in her vagina when they were in the garage.

The complainant said that the touching by Jaen occurred while she was in fifth and sixth grade at Chisholm Trail Intermediate. She stated that the garage incident occurred during the school year when she was in fifth grade and that the touching started slowing down when she was in sixth grade. She said that he was still touching her butt up until a few months before the interview.

The complainant told the forensic interviewer about riding bikes with Jaen and said that when they came home from bike riding, he would try to "finger" her. On one occasion during the summer between fifth and sixth grade, he did put his finger in her vagina, and he put his penis in her vagina. She said that this happened more than one time.

11

The complainant described a time when Jaen was working on a closet in the bedroom he shared with his wife. The complainant offered to fetch tools for Jaen, and when she brought the requested tools to him, he picked her up, put her on the bed, and put his penis in her vagina. When asked when this incident had occurred, she said that she had turned thirteen and that it was "about to be winter" because she was wearing pants. She thought this might have been the last time he put something in her vagina because around this time was when her mom started dating Eduardo, and Jaen did not put his finger or his penis in her vagina after her mother married Eduardo. She said that the touching stopped around the beginning of seventh grade.

The complainant also described an incident that had occurred in her grandmother's room, which was on the first floor of Jaen's house. While the complainant was asleep, Jaen put his hands inside her pants but not her underwear; he touched her vagina over her underwear. She could not recall when this incident occurred but said it had happened while her mother was engaged to Eduardo. She believed this occurred while she was on winter break during seventh grade.

The complainant said that the incidents would occur whenever people left the house; she estimated that they had occurred two to three times per month. She then said that it started when she was in fifth grade and ended the summer before she started seventh grade around the time that she started her period. But even after she started her period, Jaen would walk by her and touch his penis to her butt or slap her butt. He continued doing that until the first week of summer before she started high school.

The complainant also said that Jaen had tried to make her put her head down to put her mouth on his penis, but she had never complied. Whenever he took out his penis to show her, she would scream.

### F.     CPS Investigator

An investigator with CPS testified that the complainant's case was referred to her after the complainant went to the hospital with abdominal pain. The investigator was able to view the complainant's forensic interview and recalled that the complainant had been able to provide a lot of details; the investigator remembered this specific case because the complainant's "forensic interview was very detailed, so it[ had] always stuck out to [her]."

### G.     FWPD Detective

Detective Christopher Parker with the Fort Worth Police Department observed from a separate room while the complainant's forensic interview was being conducted. He recalled that the complainant had given details during the forensic interview and had identified Jaen as her perpetrator. Detective Parker testified that the complainant's statements, which were made to multiple people, were consistent.

### H.     Jaen's Case

During the defense's case, Jaen put on testimony from various individuals who stated that he was a good person and that they never saw him act sexually or improperly toward the complainant.

Jaen then took the stand. When asked whether he had ever had any sexual contact with the complainant, he answered, "Never in -- never happened, never happened." He responded, "No," when asked whether he had ever touched her genitals through her clothes or under her clothes on any occasion. He said that there was never a time when she had retrieved tools for him in the garage. He testified that he had ridden bicycles with the complainant approximately twenty times but said that his daughter was always with them and that he had never attempted to have sex with the complainant against a wall. He testified that the events that the complainant testified to regarding his bedroom never occurred. Jaen said that during all the years when the complainant had spent time at his home, the two of them were never in a room alone. Jaen believed that the complainant had made up the sexual-abuse allegations because she had gotten in trouble for skipping school. On cross-examination, Jaen admitted that he did not know the complainant's name and that he called her by a different name.

## I.     Jury Deliberations and the Outcome

During the guilt–innocence deliberations, the jury initially asked to review "both the Prosecution and Defense evidence" and later asked to view the recording of the forensic interview. The jury was brought into the courtroom to watch the recorded forensic interview, and at one point, a juror asked for it to be rewound two minutes to hear a portion repeated. After additional deliberations, the jury found Jaen guilty of sexual abuse of a young child as charged in the indictment.

## III. ANALYSIS

On appeal, Jaen argues (1) that the evidence is insufficient to support the duration or temporal separation element of the charged offense and (2) that the trial court abused its discretion by admitting the forensic-interview video. We will address each of these issues below.

### A. Sufficiency Challenge

In his first issue, Jaen argues that the State failed to provide sufficient evidence that the thirty-day duration element had been met.

#### 1. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine

whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

## 2. Applicable Law

We have recently set forth the law on continuous sexual assault (CSA):

An individual seventeen years of age or older commits the offense of CSA if: "(1) during a period that is 30 or more days in duration," he commits two or more acts of sexual abuse against a child under fourteen. Tex. Penal Code Ann. § 21.02(b)(1), (b)(2)(A). Critically, members of the jury are not required to agree unanimously "on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed." *Id.* § 21.02(d). Jurors must agree unanimously, however, that the defendant committed at least two acts of sexual abuse "during a period that is 30 or more days in duration." *Id.*; *see Clark v. State*, No. 02-19-00131-CR, 2020 WL 5949925, at *3 (Tex. App.—Fort Worth Oct. 8, 2020, no pet.) (mem. op., not designated for publication) ("[T]here must be some proof, whether circumstantial or direct, that the last act of sexual abuse occurred on at least the 29th day after the day of the first act.").

"Sexual abuse" includes aggravated sexual assault of a child and indecency with a child as were charged in this case. *See* Tex. Penal Code Ann. § 21.02(c). A person commits aggravated sexual assault against a child under fourteen if he

(i) causes the penetration of the anus or sexual organ of a child by any means;

(ii) causes the penetration of the mouth of a child by the sexual organ of the actor;

(iii) causes the sexual organ of a child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor;

(iv) causes the anus of a child to contact the mouth, anus, or sexual organ of another person, including the actor; or

(v) causes the mouth of a child to contact the anus or sexual organ of another person, including the actor[.]

*Id.* § 22.021(a)(1)(B). A person commits indecency with a child if he, with the intent to arouse or gratify the sexual desire of any person, touches the anus or genitals (including through clothing) of a child under seventeen or touches any part of the body of a child under seventeen (including through clothing) with the person's anus or genitals. *Id.* § 21.11(a)(1), (c); *see generally Stevens v. State*, No. 02-23-00122-CR, 2024 WL 3978169, at *9–10 (Tex. App.—Fort Worth Aug. 29, 2024, pet. ref'd) (mem. op., not designated for publication) (setting forth the elements of the predicate offenses underlying CSA offense).

*Cisnerosmartinez v. State*, No. 02-24-00144-CR, 2025 WL 1840568, at *7–8 (Tex. App.—Fort Worth July 3, 2025, no pet. h.) (mem. op., not designated for publication).

Moreover, "[a] child victim's outcry statement alone can be sufficient to sustain a conviction for a sexual offense." *Benge v. State*, No. 02-23-00207-CR, 2024 WL 3195086, at *4 (Tex. App.—Fort Worth June 27, 2024, no pet.) (mem. op., not designated for publication) (quoting *Jimenez v. State*, 507 S.W.3d 438, 442 (Tex. App.—Fort Worth 2016, no pet.)).

### 3.     The Jury Charge

The jury was charged as follows:

Now, if you find from the evidence beyond a reasonable doubt that Ismael Jaen, hereinafter called defendant, in the county of Tarrant, state of Texas, during a period of time that is 30 days or more in duration, on or about the 10th day of April 2011 through the 9th day of April 2016, did commit two or more acts of sexual abuse, namely: aggravated sexual assault of a child under 14, by causing the sexual organ of [the complainant] to contact the sexual organ of the defendant and/or by penetrating the sexual organ of [the complainant] with the finger of the defendant and/or indecency with a child [by] sexual contact by touching, including over the clothing, the genitals of [the complainant] and at the time of the commission of each of these acts of sexual abuse the defendant was 17 years of age or older and [the complainant] was younger than 14 years of age, then you will find the defendant guilty of the offense of continuous sexual abuse of [a] young child or children as charged in the indictment.

### 4.     Sufficient Evidence Supports Duration Element

Jaen argues that "the jury could only speculate as to when the sexual abuse allegedly occurred." Jaen focuses solely on the complainant's trial testimony and argues that because (1) she did not give a timeline for when the sexual assault after the bike ride occurred or when the "attempted sexual assault upstairs in a bedroom" occurred and (2) she said only that the inappropriate-touching incident in the garage occurred when she was in fourth grade, "the universe of sexual[-]abuse allegations is limited to her [fourth-]grade year, with no way of determining a start date." Jaen's argument ignores that other testimony at trial provided a timeline and that the forensic-interview recording—no matter whether it was properly admitted—can be considered as part of a sufficiency review. *See Jenkins v. State*, 493 S.W.3d 583, 599

18

(Tex. Crim. App. 2016) (noting that when performing a sufficiency review, we must consider all the evidence admitted at trial, even if it was improperly admitted); *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004) (same).

Here, the SANE testified that although the complainant did not provide exact dates, she said that the first time it happened was when she was ten years old and that the most recent time was when she was thirteen. This reflects that at least two incidents occurred over a period of more than thirty days in duration.

Additionally, the forensic-interview recording, which was recorded when the complainant was sixteen (five years prior to her trial testimony), provided a more concrete timeline:

| The garage incident | During the school year when she was in fifth grade |
|---|---|
| The incident after biking | During the summer between fifth and sixth grade |
| The incident in Jaen's bedroom | When she was thirteen years old (which could have been in sixth or seventh grade) |

The complainant also said that the incidents had occurred two to three times per month, that they had started when she was in fifth grade, and that they had ended the summer before she started seventh grade.

As this court noted in *Benge*, "We acknowledge that there are disparities between what the complainant told the forensic examiner and what the complainant testified to at trial. But inconsistencies do not render a child's testimony inadmissible; instead, inconsistencies go to the weight that the testimony should be given." 2024

WL 3195086, at *5. Here, the jury could have given more weight to the forensic-interview recording because it was recorded closer in time to the events at issue. And the forensic-interview recording, as well as the SANE's testimony, made clear that "during a period that is 30 or more days in duration," Jaen "commit[ted] two or more acts of sexual abuse" against the complainant.

Accordingly, we hold that the record contains sufficient evidence of the duration or temporal separation element of the offense of CSA, and we overrule Jaen's first issue.

### B.    Admissibility of Forensic-Interview Recording

In his second issue, Jaen argues that the trial court abused its discretion by admitting the video recording of the forensic interview. Jaen then sets forth Texas Rule of Evidence 801(e)(1)(B), which allows the admission of prior consistent statements of a witness, claiming that "[t]his was the sole theory under which this video was offered and admitted."[5] Jaen's statement is incorrect. Because the trial court stated two grounds for admitting the recording, and because Jaen challenges only one of those grounds on appeal, we must affirm on the unchallenged ground.

---

[5]This statement from the argument section of Jaen's brief contradicts the statement in the background section of his brief in which he correctly notes that the State "relied upon Texas Rule of Evidence 801(e)(1)([B]) and the rule of optional completeness in [its] argument."

### 1.    Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Redmond v. State*, 629 S.W.3d 534, 541 (Tex. App.—Fort Worth 2021, pet. ref'd). The admission of challenged evidence is not an abuse of discretion unless the trial court's determination lies outside the zone of reasonable disagreement. *Wells*, 611 S.W.3d at 427; *Redmond*, 629 S.W.3d at 541.

When reviewing a trial court's ruling, an appellate court will uphold the ruling if it is correct on any theory of law applicable to the case. *State v. Copeland*, 501 S.W.3d 610, 612–13 (Tex. Crim. App. 2016); *Petty v. State*, No. 02-21-00130-CR, 2022 WL 4545532, at *5 (Tex. App.—Fort Worth Sept. 29, 2022, pet. ref'd) (mem. op., not designated for publication). A theory of law is applicable to a case when it is litigated at the trial-court level. *Copeland*, 501 S.W.3d at 613; *Petty*, 2022 WL 4545532, at *5. "An appellant must attack all independent grounds supporting a trial court's ruling." *Petty*, 2022 WL 4545532, at *5 (quoting *Marsh v. State*, 343 S.W.3d 475, 479 (Tex. App.—Texarkana 2011, pet. ref'd)). If a trial court's ruling can be sustained on any independent ground, an appellant must challenge all grounds on appeal. *Id.* When an appellant fails to challenge all independent grounds supporting the trial court's ruling on appeal, we must affirm the trial court's ruling on the unchallenged ground. *Id.*

## 2.    What the Record Shows

The trial court held a hearing outside the jury's presence to determine the admissibility of the video recording of the forensic interview. The State argued that Jaen had opened the door "multiple times in significant ways to the forensic interview coming in." The State noted that the defense had put the complainant's credibility and motive at issue and had impeached her statements and argued that the forensic-interview recording should be admitted as a prior consistent statement. The State pointed out that Jaen had asked the complainant multiple questions about what she had told the forensic interviewer. The trial court initially ruled that the recording would be admitted only for record purposes so that the trial court could review it. After reviewing the video, the trial court decided to withhold ruling on its admissibility until after the forensic interviewer had been cross-examined. The trial before the jury then recommenced.

After the defense concluded its cross-examination of the forensic interviewer, the State approached the bench and sought to reoffer the recording, relying on Rule 801(e)(1)(B) for the admission of a prior consistent statement. The trial court sent the jury out of the courtroom, and after hearing argument from both sides, the trial court summarized how the defense had opened the door to the admission of the forensic-interview recording:

[Y]'all didn't have the benefit of the record. I did.[6] And I have watched the forensic interview admitted for record purposes only as State's Exhibit 18. I did that on my lunch break. It is approximately an hour and 10 minutes long.

From the very beginning, in the record, page 12, line 9, in your opening statement, you told the jury that the investigator didn't have anything[] but the [complainant] and her mother [and] the forensic interview. You made reference to it in your opening statement.

On page 12, line 9, in questioning the detective, you questioned him about viewing the forensic interview.[7]

On page 124, line 20 -- and here is where it starts -- you start questioning [the complainant], "You told the forensic interviewer you were in 10th" -- "10th grade," and you referred to the forensic interviewer -- forensic interview specifically with the language you complained in [the] forensic interview -- and now I can't read my writing.

On page 127, line 21, you made reference to the language in the forensic interview -- about telling the forensic interviewer on 12/21 [sic] that -- that there was no penile or finger penetration after married. That was on page 129, line 21.

On page 145, line 14, you asked the question, "At the time of the forensic interviewer" -- I think it was something to the effect of, "Did you know that Child Protective Services and the police were listening to the interview?"

On page 145, line 19, you asked the question, "Forensic interview about being nine years old and moving to Texas or" -- "or nine when it first happened?"

---

[6]The trial judge explained that he had gone over the record and had taken notes on the court reporter's record.

[7]Defense counsel asked Detective Parker if he had relied on information from the forensic interview in preparing his arrest-warrant affidavit; the detective answered affirmatively.

On page 146, line 23, you asked the question, "In reference to the forensic interview, you told the forensic interview about the garage that he was lifting you up, and that was the first time you" -- "you recalled" -- "incident you recalled."

And on page 146, line 2, "Did you tell [the forensic interviewer] after you" -- "it happened after you moved to Texas?" And then you asked, "Did you tell [the forensic interviewer that] you were in intermediate school when it happened?"

On the same page, line 23, "Did you tell [the forensic interviewer] it happened in the garage?"

On page 127, line 2, you made reference to the brain fog that [the complainant] was under. "You remember you told [the forensic interviewer] it was in the garage, and that was the first time?"

There was a long exchange about that for five more lines through line 7.

Then on line 15, you also referred to the forensic interview. "You told [the forensic interviewer] that was in your sophomore year and not ninth grade."

The trial court then asked if the State had any other theories under which it was offering the recording. The State responded that the recording should also be admitted under the rule of optional completeness because "it all is important for contextual purposes."

The trial court ruled that it was going to grant the State's request to admit the recording under "optional completeness, as well as prior consistent statement."

### 3. Failure to Challenge All Grounds Stated for Admissibility

Here, the trial court clearly espoused two grounds for admitting the forensic-interview recording: (1) optional completeness and (2) prior consistent statement. On

24

appeal, Jaen does not challenge the first ground for the trial court's ruling. That ground provided an independent basis for the trial court's decision to admit the recording. Because Jaen has failed to challenge that independent ground on appeal, we must affirm the trial court's ruling. *See id.* at *6. Accordingly, we overrule Jaen's second issue.

## IV. CONCLUSION

Having overruled Jaen's two issues, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: July 24, 2025